IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN R. MEYER,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security<br><br>　　　　　Defendant.<br>_____ | CASE No.: 1:09-cv-01448-JLT<br><br>ORDER ON PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>ORDER REMANDING PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING THE CLERK TO ENTER JUDGMENT IN FAVOR OF PLAINTIFF BRIAN R. MEYER AND AGAINST DEFENDANT MICHAEL J. ASTRUE |

**BACKGROUND**

Plaintiff Brian R. Meyer ("Plaintiff") seeks judicial review of an administrative decision denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act (the "Act").

**FACTS AND PRIOR PROCEEDINGS[1]**

On April 19, 2006, Plaintiff filed an application for DIB under Title II of the Act in which he alleged that he suffered from a disability with a claimed onset date of January 31, 2004. AR at 128. Subsequently Plaintiff filed an application for SSI benefits under Title XVI of the Act. Id. at

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

1  134-39.  After his applications for benefits were denied by the Agency, Plaintiff requested a
2  hearing before an Administrative Law Judge ("ALJ").  On August 8, 2008, the ALJ issued a
3  decision denying benefits.  Id. at 4-16.  Specifically, the ALJ found that Plaintiff was not disabled
4  within the meaning of the Act.  Id. at 16.  On June 26, 2008, the Appeals Council affirmed this
5  decision.  Id. at 1-3.
6      Hearing Testimony
7      At the administrative hearing held on June 4, 2006, Plaintiff testified that he had a 10th
8  grade education but had not obtained a GED.  AR at 31.  He stated that he could read and write.
9  Id.  Plaintiff stated that he did not have a driver's license.  Id.
10     Plaintiff testified that he was a trained and certified forklift operator.  AR at 32.  He stated
11 that he last worked at a movie gallery putting away movies and working the cash register.  Id.  He
12 estimated that he worked at this job for about six months through December 2003.  Id.  He
13 indicated that this was a part-time job.  Id.
14     Prior to his work at the movie gallery, Plaintiff testified that he performed temporary work
15 in shipping and receiving at a warehouse.  AR at 33.  He stated also that he did some forklift work.
16 Id. at 34.  He said that none of these jobs lasted longer than six- to eight- months.  Id.  He stated
17 that this work was full-time work.  Id. at 35.  Plaintiff testified that before the warehouse temporary
18 work he worked in fast food restaurants.  AR at 35.
19     Plaintiff testified that he did not believe that he could work full-time.  AR at 36.  He
20 reported that he experienced pain in his right leg and back and in his left shoulder due to a
21 dislocation.  AR at 36.  He characterized his leg pain as "constant," "throbbing" and "electric" and
22 stated that it  moved from his lower back to his toes.  Id.  He stated that the pain centered mostly in
23 his calf but described chronic soreness in his back as well.  Id.  He believed that this pain derived
24 from a car accident in 1999.  Id. at 37.
25     Plaintiff testified that he had received treatment for his physical maladies for the last four-
26 to six-years. AR at 37.  He reported that his most recent diagnosis was tarsal tunnel syndrome and
27 stated that he had surgery for this condition.  Id.  He did not believe that the surgery was successful
28 because he still had constant pain and numbness in his foot.  Id.  He categorized the pain at 7 on a

1  10 point scale. Id.

2  Plaintiff testified that he took Vicodin for the pain but claimed it was only partially
3  effective. AR at 38. He stated that he smoked marijuana to help with the pain also. Id. He
4  claimed that a doctor okayed his use of "medical marijuana." Id. at 54. Plaintiff stated that he took
5  cortisone injections for his foot pain but maintained that it was also only partially effective. Id. at
6  41-42.

7  Plaintiff stated that he elevated his foot to alleviate the pain. AR at 39. In addition, he
8  testified that for the last six or seven years he would lay down for an average of 8 hours in a 12-
9  hour day to limit his pain and stay "comfortable." Id. at 39-40. He stated that he could slowly
10 ascend stairs. Id. at 40. He testified that a doctor prescribed a cane to help him ambulate. Id. He
11 claimed that he used the cane "everywhere I go." Id. at 41.

12 Plaintiff testified that he had a chronic left shoulder dislocation. AR at 42. He estimated
13 that the shoulder dislocated approximately five- to six-times a year. Id. When this happened, he
14 stated that he would need to go to the hospital to have it put back in the socket. Id. at 43. He
15 stated that after his shoulder dislocated, he experienced residual pain, usually for about three or
16 four weeks . Id. He took Vicodin and Tylenol to help with the pain and stated that it helped
17 alleviate this pain much better than his foot pain. Id. As a result of his shoulder impairment,
18 Plaintiff testified that he could not extend his left arm fully in any direction and had problems
19 reaching, grabbing and picking up anything that weighed more than five pounds. Id. Plaintiff
20 stated that doctors considered surgery on his shoulder but nothing had been done up to the time of
21 the hearing. Id. at 44.

22 He stated that he had difficulty sitting in a chair because it would cause pressure in his back
23 and right leg. AR at 44.  As a result, he believed that he could not sit for more than 15 minutes at
24 a time. Id. at 45. Plaintiff believed that he could stand about 15 minutes at a time with the help of
25 a cane. AR at 45. He stated that he could walk about one block at a time. Id.

26 Plaintiff testified that he had surgery on his right wrist for numerous "tumors" that
27 hampered the nerves. AR at 45. He stated that this condition was extremely painful and hindered
28 his ability to grip with his right hand. Id. Plaintiff claimed that he had difficulty holding a pencil

and writing (Plaintiff is right-handed). AR at 46. He believed that he could not grip a pencil for more than one minute without needing to pause for a few minutes before resuming writing. Id. Nevertheless, Plaintiff estimated that he could lift up to 25 pounds with his right arm and that he had not been treated for this condition since 1998 or 1999. Id. at 45

Plaintiff testified that he was bipolar with intermittent Rey's Syndrome. AR at 46. He described suffering from a personality disorder that involved depression, anxiety, anger and mood swings. Id. He recounted that he had anxiety all of the time and was "real high strung." Id. at 49. He described having "psychotic thoughts" as well. Id. at 46. In particular, he described plotting to murder people who angered him. Id. at 50. He stated that although sometimes he wanted to hurt other people, his physically maladies made it difficult for him to act on such thoughts. Id. at 51.

Plaintiff stated that he was depressed all of the time. AR at 47. He stated that this condition affected his ability to function normally. Id. In particular, he recounted having no drive. He stated that he took medications like Abilify, Cogentin and Lexapro for his depressive condition. Id. He testified that these medications caused him to sleep a lot. Id.

Plaintiff believed that he could concentrate and focus "pretty good" but claimed that this ability varied. AR at 49. He testified that he occasionally did dishes at home but not much other work. Id. at 52. He stated that he wished that he could fix his leg and back pain and work because he had worked since the age of 16 and would prefer to work. Id. at 53.

Plaintiff stated that he walked to help alleviate his depression. AR at 48. He explained that this helped him to get away from others because he didn't like being around large numbers of people. Id. In addition to taking medication for his mental impairments, Plaintiff stated that he saw a psychiatrist approximately once every two or three months. Id. at 50. Plaintiff testified that he had no social life since his 1999 car accident. AR at 48. He attributed this to the fact that his impairments made it difficult for him to get around. Id.

Plaintiff stated that he spent 10-11 months in jail for illegal drug use in 2004. AR at 51-52. He testified that he went through programs to help with drug addiction and had not relapsed since his release from jail. See id. at 52.

A vocational expert ("VE"), Thomas C. Dachelet, testified also.[2] He described Plaintiff's general warehouse work as medium and unskilled and his forklift work as medium and semi-skilled. AR at 56. He described Plaintiff's work as a cashier and as a fast-food worker as light and unskilled. Id. He categorized Plaintiff's work in shipping and receiving as medium and semi-skilled. Id. at 57.

In his first hypothetical, the ALJ described a person of Plaintiff's age, education and work experience. AR at 57. This person could lift 20 pounds occasionally and 10 pounds frequently; stand/walk for two hours in an eight-hour day and sit for six hours. Id. The person could occasionally push and pull with the right leg; never climb ladders, ropes or scaffolds; occasionally kneel, crouch, crawl and climb stairs or ramps; frequently balance and stoop; and occasionally reach above shoulder-level with the left arm. Id. The person should also avoid walking on uneven surfaces, and was limited to work involving simple, repetitive tasks with only limited contact with the public. Id.

The VE opined that such a person could not perform any of Plaintiff's past work, but could perform other sedentary, unskilled work. AR at 58. As examples, the VE cited the jobs of ampoule sealer, loader of semiconductor dies, and weight tester. Id. The VE stated that his opinion was consistent with the requirements of the Dictionary of Occupational Titles ("DOT") for such jobs. Id. at 59.

In a second hypothetical, the ALJ added a restriction to occasional handling, fingering and feeling with bilateral hands. AR at 58. With this additional restriction, the VE believed that the person could perform no work. Id. at 59.

In a third hypothetical, the ALJ described a person of Plaintiff's age, education and work experience, who, regardless of any physical restrictions, could not consistently maintain a regular work schedule or maintain concentration and attention consistently through an eight-hour work day. AR at 59. The VE opined that such a person could not perform any work. Id.

---

[2] The transcript identifies the VE as "Mr. Dashlick." AR at 24, 55. This appears to be a phoenetical spelling by the court reporter. In his decision, the ALJ identifies the VE as Thomas C. Dachelet and the Court accepts this as the correct name. Id. at 14.

Relevant Medical Evidence

Because Plaintiff does not challenge the correctness of that ALJ's Residual Functional Capacity ("RFC") assessment and because he raises no challenge to the ALJ's findings concerning the severity of his mental and physical impairments, the Court provides an abbreviated recitation of the medical evidence.

In July 2006, Dr. Rustom Damania, an agency consultative examiner, conducted a physical examination of Plaintiff. AR at 177-79. Based upon his examination and a review of Plaintiff's medical history, Dr. Damania diagnosed Plaintiff with tarsal tunnel syndrome in the left foot post-status surgery (eight months) with no improvement. Id. at 179. In addition, Dr. Damania diagnosed a recurrent left shoulder dislocation with no surgeries that last occurred two years prior to the examination. AR at 179.

Dr. Damania concluded that Plaintiff could walk and stand for two hours in a work day but could sit without restriction. AR at 179. He believed that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently with no postural limitations on bending or stooping. Id. In addition, he determined that Plaintiff could kneel and squat on a frequent basis but found no manipulative or communicative impairments. Id. Also, he believed that Plaintiff would have "multiple workplace environmental limitations which include balancing and climbing." Id.

On August 14, 2006, Dr. A.M. Khong, a non-treating agency consultant, completed a physical RFC Assessment form based upon a review of Plaintiff's medical records. Dr. Khong noted Dr. Damania's findings and conclusions and believed that, in addition, Plaintiff was prohibited from frequent above shoulder reaching with the left upper extremity due to his history of recurrent dislocations. AR at 182.

In March 2007, Plaintiff was examined by an agency consultative psychiatrist, Dr. Greg Hirokawa. Dr. Hirokawa reviewed Plaintiff's medical history and performed a mental status examination. AR at 215-16. He diagnosed Plaintiff with bipolar disorder; generalized anxiety disorder; personality disorder with borderline and antisocial features; methamphetamine dependence reportedly in remission; and marijuana dependence. Id. at 216.

Dr. Hirokawa characterized Plaintiff's bipolar disorder as mild but noted a significant

personality disorder characterized by poor interpersonal skills, problem relationships and poor frustration tolerance, and a negative work history due to an inability to get along with co-workers or meet attendance and timeliness requirements. AR at 217. He believed that Plaintiff's depression had worsened due to physical problems. Id.

In all areas of cognitive functioning, including the ability to understand, remember, and carry out short and simple instructions; accept instructions from supervisors; social judgment; the ability to interact with co-workers; and the ability to complete a normal workday without interruptions from psychologically based symptoms, Dr. Hirokawa found Plaintiff to be no more than mildly or moderately limited. AR at 217-18. He documented a Global Assessment of Functioning ("GAF") score of 61.[3] Id. at 217.

On April 27, 2007, Dr. L.T. Luu, a non examining mental health consultant, completed a mental RFC Assessment form based upon a review of Plaintiff's medical records. Dr. Luu noted an Affective Disorder. AR at 221. However, he concluded that this impairment had only mild to moderate affect on Plaintiff's ability to operate in the realms of activities of daily living, social functioning, and maintaining concentration, persistence and pace. Id. at 229. He found no evidence of decompensation. Id.

Dr. Luu believed that Plaintiff was "moderately limited" in his ability to understand, remember, and carry out detailed instructions, and in his ability to interact with the general public. AR at 232-33. Nevertheless he opined that Plaintiff retained the ability to adapt to simple restrictions, carry out simple tasks, interact with the public on a limited basis, and adapt to changes in the work place. Id. at 233.

ALJ Findings

The ALJ evaluated Plaintiff pursuant to the customary five-step sequential evaluation. The ALJ determined first that Plaintiff had not engaged in substantial gainful activity since the claimed onset of his disability on January 31, 2004. AR at 9. Second, he found that Plaintiff had the

---

[3] A person with a GAF score of 61 is described in the Diagnostic and Statistical Manual of Mental Disorders, 4th ed. (2000) ("DSM-IV"), as falling into the category of "some mild" symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships. Id. at 34.

7

following severe impairments: bipolar disorder, Type II; personality disorder, not otherwise specified, with borderline and antisocial features; tarsal tunnel syndrome of the right foot, status post surgery; and a history of dislocation of the left shoulder. Id. Third, the ALJ determined that Plaintiff did not have an impairment, or a combination of impairments, that met or exceeded the level required under Agency guidelines for presumed disability. Id.

Fourth, the ALJ determined that Plaintiff had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for a total of two hours and sit for a total of six hours in an eight-hour workday; occasionally push and pull with the right lower extremity; never climb ladders, ropes or scaffolds; occasionally kneel, crouch, crawl, and climb ramps or stairs; frequently balance and stoop; and occasionally reach above the shoulder with the left upper extremity. AR at 10. In addition, he determined that Plaintiff should avoid walking on uneven terrain, but determined also that he could perform simple tasks, with limited contact with the general public. Id.

The ALJ found that Plaintiff could not perform his past relevant work but, based on his RFC assessment and the testimony of the VE, the ALJ concluded that Plaintiff retained the ability to perform other work in the national economy (step five). Id. at 16-17. As a result, the ALJ determined that Plaintiff was not disabled as defined by the Act. Id. at 17.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. When reviewing the findings of fact, the Court must determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. 405 (g).

Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The Court must uphold the determination that the claimant is not disabled if the Commissioner applied the proper legal

standards and if the findings are supported by substantial evidence. *See* <u>Sanchez v. Sec'y of Health and Human Serv.</u>, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which include the five-step sequential disability evaluation process described above. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[4] As noted, applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) had medically determinable severe impairments (bipolar disorder, Type II; personality disorder, not otherwise specified, with borderline and antisocial features; tarsal tunnel syndrome of the right foot, post status surgery; and a history of dislocation of the left shoulder); (3) did not have an impairment which met or equaled one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) could not perform his past relevant work; but (5) retained the RFC to perform other work related activities. AR at 11-17. The ALJ then determined that Plaintiff was not under a "disability" as defined in the Act. <u>Id</u>. at 17.

Plaintiff challenges the ALJ's determination at step five of the sequential evaluation process, where his ability to perform work other than his past relevant work was assessed based upon his RFC.

---

[4] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

**DISCUSSION**

Plaintiff raises one claim on appeal. He asserts that given the ALJ's RFC Assessment, limiting him to only occasional reaching above shoulder level with the left upper extremity, the ALJ"s reliance on the VE's testimony to conclude that Plaintiff could perform jobs such as ampoule sealer, loader of semiconductor dies, and weight tester, was error. (See Doc. 17 at 6-13).

At the hearing, the ALJ described, in his first hypothetical, a person of Plaintiff's age, educational background and work experience who was restricted, *inter alia*, to "occasionally reach[ing] above shoulder level with his left arm." AR at 57. Based upon this hypothetical, the VE opined that Plaintiff could not perform any of his past work but could perform other "sedentary, unskilled work." Id. at 58. The VE specifically identified jobs such as ampoule sealer, loader of semiconductor dies, and weight tester. Id.

In his RFC assessment, the ALJ adopted the restriction set forth in this hypothetical including, most particularly, a restriction for "reach[ing] above shoulder level with [the] left upper extremity." AR at 10. The ALJ accepted also the VE's testimony that Plaintiff's impairments (based on the first hypothetical) prevented him from performing his past relevant work (step four). Id. at 14. However, the ALJ concluded that Plaintiff retained the ability at step five to perform other work of a sedentary, unskilled nature, and cited again the VE's opinion and his identification of the jobs of ampoule sealer, loader of semiconductor dies, and weight tester to support this determination.[5] Id. at 15. The ALJ found also, without providing any explanation, that the VE's

---

[5] The DOT describes the position of loader, semiconductor dies as,

> Loads, dies, using vacuum wand, into carriers that hold and protect dies during fabrication of semiconductor packages: Pours dies from container onto filter paper. Picks up and places dies circuit-side up in indentations in carrier, using vacuum wand. Secures lid on carrier, using manual pressure. May clean dies prior to loading, using solutions and cleaning equipment. May sort semiconductor devices to remove defective devices marked in inspection department.

(Doc. 17-1 at 1; Doc. 19 at 18). The DOT describes the position of ampule sealer as,

> Seals ampoules filled with liquid drug products, preparatory to packaging: Rotates neck of ampoule in flame of bunsen burner to melt glass. Grips tip of ampoule in basket for sterilization and inspection. May hold unsealed ampoule against jet or inert gas to displace air. May immerse sealed ampoules in dy bath to test for leaks. May tend machines that steam-wash and fill ampoules.

10

opinion was consistent with the DOT. Id. Based upon these findings, the ALJ determined that Plaintiff was not disabled. Id. at 16.

Plaintiff contends that given the restriction in the ALJ's RFC finding to "occasional" reaching above shoulder level with the left upper extremity, Plaintiff could not perform the jobs identified by the VE. Specifically, he notes that the DOT provides that the job of loader of semiconductor dies requires the ability to reach "constantly," while the jobs of weight tester and ampoule sealer require "frequent" reaching. (See Doc. 17-1 at 5, 11, 17; Doc. 19 at 10, 15, 20). He asserts that the failure of the ALJ to seek an explanation from the VE for the apparent discrepancy between his opinion and the reaching requirements for these jobs as outlined in the DOT was error warranting remand.

Social Security Ruling ("SSR") 00-4p states, in pertinent part,

> Occupational evidence provided by a VE or VS generally should be consistent with information supplied by the DOT. When there is an apparent conflict between the VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

The "best source" for how a job is generally performed is "usually" the DOT. Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001). In order for the ALJ to accept vocational expert testimony that

---

(Doc. 17-1 at 7; Doc. 19 at 13).

The DOT describes the position of weight tester as,

Tends machine that records variations in weight along sample strip of paper or other material: Inserts end of sample strip into testing machine to obtain reading on graph of basic weight of sample. Turns dial to bring weight indicator to center line on graph to calibrate machine for weight of material tested. Starts feed rolls that carry sample strip through machine to record variations in weight of material on graph. Calculates percentage variation in material weight, using formula or chart. Fills machine ink reservoir, using dropper.

(Doc. 17-1 at 13; Doc. 19 at 8).

conflicts with the DOT, the record must contain "'persuasive evidence to support the deviation.'" Id. at 846. Moreover, the ALJ has an affirmative duty to ask "whether [the VE's] testimony conflicts with the *Dictionary of Occupational Titles*." Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007). Not only must the ALJ ask the VE if his or her opinion is consistent with the DOT, *the ALJ must "obtain a reasonable explanation for any apparent conflict."* Id. at 1152-53 (emphasis added).

Here, after the VE offered his opinion, the ALJ asked him if his findings were consistent with the DOT. AR at 59. The VE responded simply "Yes, Your Honor." Id. The ALJ did not ask any further questions or seek additional explanation. As noted, according to the DOT the jobs cited by the VE require, at a minimum, the ability to engage in "frequent" reaching. "Frequent" reaching requires the ability to reach "from 1/3 to 2/3 of the time" in a workday. (Doc. 17-1 at 11, 17). By contrast, the ability to reach "occasionally" requires the ability to reach less than 1/3 of the time. (Id.) Despite this discrepancy, the ALJ failed to seek a "reasonable explanation" from the VE as to how a person restricted to occasional reaching with the left arm, could perform jobs that require the ability to reach frequently or constantly. See Pinto, 249 F.3d at 847 ("in order for the ALJ to rely on a job description in the Dictionary of Occupational Titles that fails to comport with a claimant's noted limitations, the ALJ must definitively explain this deviation"); See Massachi, 486 F.3d at 1152-53 (holding that in asking the VE if the evidence he or she is providing is consistent with the DOT, the ALJ should "obtain a reasonable explanation of an apparent conflict").

Defendant argues also that the jobs cited by the VE involve "desk work and moving vials, ink, and paper" and notes that Plaintiff has no restriction to reaching with his dominant right arm. (Doc. 19 at 5). Defendant argues, therefore, that there is no inconsistency between the DOT and the VE because "[n]o where in the DOT description is there mention of a need to reach overhead with both hands." (Doc. 19 at 5). This very well may be true. This type of guesswork by the Court is prohibited and is "exactly the sort of inconsistency the ALJ should have resolved with the expert's help." Prochaska v. Barnhart, 454 F.3d 731, 736 (7th Cir. 2006). Notably, there is no indication in the record that the ALJ was *even aware* that reaching, more than occasionally, was

required by these jobs or any explanation why, with this job requirement, reaching with only the right arm was sufficient.

In Marshall v. Astrue, 2010 U.S. Dist. LEXIS 23703, *14-16 (S.D. Cal. 2010), the court considered a similar situation. The VE was presented with a limitation of only occasional "left upper extremity" overhead reaching. Id. In response, the VE identified various jobs. Id. Upon review, the court determined that each of the jobs identified by the VE required frequent or constant reaching. Id. In determining that the court could not *assume* that the unrestricted capability for overhead reaching with one arm was sufficient, the court held,

> The DOT makes no distinction between reaching with the left or right hand in its guidelines. Moreover, there is no indication in the ALJ's written decision that the ALJ was aware of the conflict created with respect to the reaching capacity of Plaintiff's left extremity when the vocational expert's testimony is compared to the DOT. Consequently, the ALJ's written determination provides no explanation as to how to resolve the conflict created by the vocational expert's identification of potential occupations which the DOT indicates require constant or frequent reaching but is silent as to handedness when the Plaintiff has significant restrictions placed on her left extremity only. As a result, the Court cannot accept the ALJ's determination which relies on the vocational expert's testimony that there are positions in the national economy available to Plaintiff. Without more, the Court has no way to determine whether substantial evidence supports the ALJ's decision.

Id. Therefore, under these circumstances, the ALJ's failure to elicit further explanation for the apparent incongruence between the DOT and the VE's opinion on this issue was error and left leaves "unresolved potential inconsistenc[ies] in the evidence." Massachi, 486 F.3d at 1154 n. 20).

Finally, Defendant appears to contend that the VE's statement that his opinion did not conflict with the DOT is not conclusive that there was no disparity. (See Doc. 19 at 5). Seemingly, Defendant is asserting that the Court should presume that the VE was aware of the reaching requirement but that reaching with one arm was all that was required. However, by definition, this is an *apparent* conflict. Given this apparent conflict, SSR 00-4p places an affirmative obligation on the ALJ not merely to ask if the VE's opinion comports with the DOT but to obtain an explanation for any apparent conflict. In the absence of an explanation, the ALJ's decision, that Plaintiff could perform other work in the economy, is not supported by substantial evidence. Dieugenio v. Astrue, 2010 U.S. Dist. LEXIS 3894 at *8-11 (C.D. Cal. Jan. 19, 2010) (holding that where the VE claimed that his testimony was consistent with information in the DOT

1  but review of the DOT "reveals a conflict with respect to the jobs identified," SSR 00-4p required
2  the ALJ to address the apparent conflict and his failure to do so warranted remand for further
3  proceedings).

4     2. Remand for further proceedings is appropriate

5  The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or
6  to order immediate repayment of benefits is within the discretion of the district court. Harman v.
7  Apfel, 211 F.3 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency
8  determination, the proper course, except in rare instances, is to remand to the agency for additional
9  investigation or explanation. Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (citing INS v.
10 Ventura, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed where no useful
11 purpose would be served by further administrative proceedings, or where the record is fully
12 developed. Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1399 (9th Cir.
13 1988).

14 Plaintiff concedes that the appropriate remedy is to remand for further proceedings "for the
15 correction of the legal errors." (Doc. 17 at 13). In light of the ALJ's RFC assessment with regard
16 to reaching with the left upper extremity, and his failure to seek an explanation from the VE for the
17 apparent inconsistency between the VE's opinion concerning Plaintiff's ability to perform certain
18 jobs and the reaching requirements for such jobs in the DOT, the Court concludes that remand for
19 further proceedings is appropriate. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989) (the
20 decision to remand for further proceedings or simply award benefits is within the discretion of the
21 court).

**CONCLUSION**

23 Based on the foregoing, this matter is HEREBY REMANDED for further proceedings
24 consistent with this decision. The Clerk of Court IS DIRECTED to enter judgment in favor of
25 Plaintiff.
26 IT IS SO ORDERED.
27 Dated:  **October 1, 2010**                          /s/ Jennifer L. Thurston
                                                  UNITED STATES MAGISTRATE JUDGE
28